UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

VANGUARD GRAPHICS LLC,
*d/b/a Vanguard Printing*; and
KOURSA, INC.,

          Plaintiffs,

     v.              3:17-CV-1322
                        (FJS/ML)
HARTFORD FIRE INSURANCE COMPANY,

          Defendant.
_____

APPEARANCES           OF COUNSEL

**BOND, SHOENECK & KING, PLLC**   **BRENDAN M. SHEEHAN, ESQ.**
One Lincoln Center          **THOMAS R. SMITH, ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiffs

**MOUND, COTTON, WOLLAN &**   **LLOYD A. GURA, ESQ.**
**GREENGRASS LLP**         **SANJIT SHAH, ESQ.**
One New York Plaza
44th Floor
New York, New York 10004
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

  Pending before the Court are Plaintiffs' motion for partial summary judgment, *see* Dkt. No. 54, and Defendant's cross-motion for summary judgment, *see* Dkt. No. 55, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. BACKGROUND

In late 2014, Plaintiff Koursa purchased a 2001 Heidelberg Sunday 4000 printing press (the "Press") from a company in Denmark. *See* Dkt. No. 54-2, Pls' Stmt. of Facts, at ¶ 4. Following that purchase, Plaintiff Koursa entered into a services agreement with Total Press Sales and Service, LLC ("Total Press"), pursuant to which Total Press was required to dismantle the Press in Denmark, transport it to the United States, and install it at a yet-to-be identified site. *See id.* at ¶ 6. In an amendment to that services agreement, the Press components were to be stored in two warehouse locations in New Jersey, owned and operated by Trans American Trucking Service, Inc., until Plaintiff Koursa made a final determination as to where the Press would be installed. *See id.* at ¶ 8.

In the spring of 2016, the principal owner of Plaintiff Koursa acquired an indirect ownership interest in Plaintiff Vanguard; and, on March 31, 2016, Plaintiffs entered into an agreement pursuant to which Plaintiff Vanguard leased the Press from Plaintiff Koursa. *See id.* at ¶¶ 9-10. Plaintiff Koursa assigned its rights and obligations under the services agreement with Total Press to Plaintiff Vanguard. *See id.* at ¶ 11. Total Press agreed to deliver the Press components to Plaintiff Vanguard's plant in Ithaca, New York, and install it at that location. *See id.*

In the process of transporting, delivering, and installing the Press at Plaintiff Vanguard's plant, Total Press—or its agents or subcontractors—caused physical damage to various components of the Press. *See id.* at ¶¶ 12-13. It also caused damage to Plaintiff Vanguard's rear parking lot. *See id.* at ¶ 14. Some of the damage was caused in the process of loading parts of the Press onto trucks and transporting them from the warehouse locations to the plant, whereas damage to other parts of the Press occurred after arrival at the plant during the process

of uncrating the parts, staging them for assembly, and moving them into place for installation. *See id.* at ¶¶ 15-16. The "rigging contractor," Britton Services, also caused damage to the Press, including to Print Unit Number 3, when it set the print unit on wood blocks prior to installation and one of the blocks collapsed, thus causing the print unit to fall to the ground. *See id.* at ¶¶ 17-20.

According to the schedules Total Press provided to Plaintiff Vanguard, the Press was supposed to be fully installed and ready for commercial operation by late October or early November, no later than November 9, 2016. *See id.* at ¶ 32. However, the Press was inoperable when it arrived at Plaintiff Vanguard's plant in August 2016. *See* Dkt. No. 1, Compl., at ¶ 17. It was not fully repaired and put into operation until May 2017. *See* Dkt. No. 55-18, Def's Stmt. of Facts, at ¶ 30.

Plaintiffs Vanguard and Koursa were named insureds of a Special Multi-Flex Business Insurance Policy (the "Policy") that Defendant issued for April 1, 2016 through April 1, 2017. *See* Dkt. No. 54-2 at ¶ 21. According to Plaintiffs, the Policy provided "all risk" coverage, meaning Defendant provided coverage for direct physical loss or damage to "Covered Property," unless excluded or limited in the Policy. *See id.* at ¶ 22.[1]

On April 28, 2017, Plaintiff Vanguard made a formal claim for losses it sustained as a result of the direct physical damage to the Press and the lost business income and extra expense that it incurred as a result of the damaged Press. *See id.* at ¶ 61. Defendant investigated that claim from May 2017 until September 25, 2017, when it issued a denial of coverage. *See id.* at ¶ 62. Defendant initially disclaimed coverage based upon an exclusion for property in the care,

---

[1] Defendant does not deny this point, but it contends that the scope of coverage under the Policy is a question of law. *See* Dkt. No. 56, Def's Response to Pls' Stmt. of Facts, at ¶ 23.

custody and control of the insured, and under an exclusion entitled "Acts, Errors or Omissions." *See id.* at ¶ 63. However, after receiving additional information from Plaintiff Vanguard, Defendant issued a revised denial letter on October 19, 2017, eliminating its reliance on the care, custody and control exclusion, but continuing to rely on the Acts, Errors or Omissions exclusion, and, in particular, a portion of that exclusion that excludes damages arising from "workmanship." *See id.* at ¶ 64.

In response, Plaintiffs filed their complaint in this action on December 6, 2017. *See generally* Dkt. No. 1. In Plaintiffs' complaint, they alleged a cause of action for a declaratory judgment that they are entitled to coverage under the Policy for (1) the cost in parts and labor to repair and replace the physical damage to the Press and the parking lot; (2) the cost in parts and labor to complete installation of the Press; (3) the cost to retain and utilize a printing service provider and supplier to assess and remediate the damage to the Press; (4) lost business income; (5) lost labor and delayed maintenance savings; and (6) the cost of Plaintiff Vanguard's lease payments to Plaintiff Koursa pursuant to the equipment lease agreement from August 2016 to May 2017. *See id.* at ¶¶ 35-41(a)-(f). Plaintiffs' second cause of action is for a judgment affixing the amount of money to which Plaintiffs are entitled under the Policy. *See id.* at ¶¶ 42-43. Pending before the Court are Plaintiffs' motion for partial summary judgment with respect to their claim for a declaratory judgment, *see* Dkt. No. 54, and Defendant's motion for summary judgment dismissing Plaintiffs' complaint in its entirety, *see* Dkt. No. 55.

# III. DISCUSSION

## A. Legal standard governing motions for summary judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under this Rule, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, a court must resolve any ambiguities and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

## B. Plaintiff Koursa's standing in this action

As an initial matter, Defendant contends in its motion for summary judgment that Plaintiff Koursa does not have standing to bring this action because it did not suffer any damages. *See generally* Dkt. No. 55-19, Def's Memorandum in Support, at 24. Specifically, Defendant argues that Plaintiff Koursa did not sustain any loss of business income as a result of the damage to the Press because Plaintiff Vanguard paid Plaintiff Koursa all of the lease payments to which it was entitled pursuant to their lease agreement while the Press was inoperable. *See id.* Plaintiffs, to the contrary, assert that Plaintiff Vanguard did not make all such payments to Plaintiff Koursa because the Press was not operational; and, in fact, Plaintiff Koursa never received $116,400 of rental income. *See* Dkt. No. 59, Pls' Memorandum in Opposition, at 28. Plaintiffs contend that such outstanding payments plainly constitute lost "Business Income" under the Policy because that term expressly includes "Rental Income and Royalties." *See id.* (citing Dkt. No. 54-2 at ¶ 82).

Under New York law, "[p]arties to an insurance contract, *i.e.*, the issuer, a named insured or a person claiming to be an insured under the policy, may bring a declaratory

judgment action against each other when an actual controversy develops concerning the extent of coverage, the duty to defend, or other issues arising from the insurance contract[.]" *Bierzo Constr. Corp., LLC v. Everest Nat'l Ins. Co.*, No. 113011/07, 2009 WL 1059899 (Sup. Ct. N.Y. Cnty. Apr. 14, 2009) (citing *Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 787 N.Y.S.2d 211 [2004]); *see also Rosano v. Freedom Boat Corp.*, No. 13-CV-842 (SJF)(AYS), 2015 WL 4162754, *4 (E.D.N.Y. July 8, 2015) (noting that "'[o]nly the policy owner has standing to sue based on an insurance policy.'" (quoting *Pike v. New York Life Ins. Co.*, 72 A.D.3d 1043, 1049, 901 N.Y.S.2d 76 (App. Div. 2d Dep't 2010))). Plaintiff Koursa is a named insured of the Policy. *See* Dkt. No. 54-5, Smith Decl., Ex. 1 at 10; *see also* Dkt. No. 54-2 at ¶ 21. As such, the Court finds that Plaintiff Koursa has standing to sue Defendant for a declaratory judgment enforcing the terms of that Policy. Insofar as Defendant asserts that Plaintiff Koursa has not suffered any *damages* as a result of the alleged breach of the Policy, Defendant would need to make that argument at trial. There is a genuine dispute of fact; and, thus, it is the factfinder's responsibility to determine what amount of damages, if any, Plaintiff Koursa is entitled.

**C. The Acts, Errors or Omissions exclusion**

The parties do not dispute that the Press constituted "Covered Property" under the insurance agreement or that the damage to the Press – which was caused primarily by cargo shifting in transit and when a wood block supporting Print Unit Number 3 collapsed – constituted a "covered event" under the Policy. *See* Dkt. No. 59 at 7 (citing Dkt. No. 55-19 at 15-19). The primary dispute between the parties is whether the Acts, Errors or Omissions exclusion (the "Exclusion") in the insurance agreement precludes coverage for Plaintiffs' losses. The Exclusion provides that the Policy does not apply to loss or damage as a result of the following:

> Acts, errors or omissions by you or others, whether before or after the acquisition of any Covered Property, in any of the following activities:
>
> (1) Planning, zoning, developing, surveying, testing or siting property;
> (2) Establishing or enforcing any building code, or any standard, ordinance or law about the construction, use, or repair of any property or materials, or requiring the tearing down of any property, including the removal of its debris; or
> (3) Any of the following as to any part of land, buildings, roads, water or gas mains, sewers, drainage ditches, levees, dams, other structures or facilities, or to or for any Covered Property:
> (a) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; or
> (b) Furnishing of work, materials, parts or equipment in connection with the design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction.
>
> The Acts, Errors or Omissions Exclusion applies whether or not the property or facilities described above are Covered Property under this policy or on or away from a "Scheduled Premises".
>
> But if direct physical loss or direct physical damage to Covered Property by fire, explosion or "Sprinkler Leakage" results, we will pay for the resulting loss or damage caused by that fire, explosion or "Sprinkler Leakage".

*See* Dkt. No. 54-5, Ex. 1 at 64.[2]

Specifically, the parties dispute whether faulty "workmanship" caused damage to the Press, thus excluding it from coverage. Plaintiffs argue that none of the activities contemplated by the Exclusion identify or relate to transporting, unloading, or installing equipment. *See* Dkt. No. 54-1, Pls' Memorandum in Support, at 16. Instead, Plaintiffs assert, the term "workmanship" applies only to the development, construction, and maintenance of structures and infrastructure on real property. *See id.* Defendant, to the contrary, contends that the Exclusion is clear and unambiguous. *See* Dkt. No. 55-19 at 18. According to Defendant, the parties do not dispute that the Press components were damaged as a result of Total Press's

---

[2] References to page numbers in documents in the record are to the page numbers that the Court's Electronic Filing System generates.

- 7 -

negligence when performing the work that they were hired to do. *See id.* at 19. Thus, Defendant asserts that the Exclusion precludes coverage for the loss as "workmanship." *See id.*

"When a dispute arises involving the terms of an insurance contract, New York insurance law provides that '"an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."'" *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995))) (other citation omitted). "When the provisions are unambiguous and understandable, courts are to enforce them as written." *Id.* (citation omitted). "Whether a contract is ambiguous, however, is a 'threshold question of law to be determined by the court.'" *Id.* (quoting *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005)) (other citation omitted). "'An ambiguity exists where the terms of an insurance contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'" *Id.* (quoting *Morgan Stanley Group Inc.*, 225 F.3d at 275 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997))) (other citations omitted).

"[T]o 'negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon.'" *Id.* (quoting *Throgs Neck Bagels, Inc. [v. GA Ins. Co. of N.Y.]*, 241 A.D.2d at 71, 671 N.Y.S.2d [66,] 69 [(1st Dep't 1998)] (internal

quotation marks and citation omitted; alteration in original)). "Under New York insurance law, '[t]he burden, a heavy one, is on the insurer, and [i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.'" *Id.* (quoting *Pepsico, Inc.* [*v. Winterthur Int'l Am. Ins. Co.*], 788 N.Y.S.2d [142,] 144 [(2nd Dep't 2004)] (internal citations and quotations omitted; second alteration in original)) (other citations omitted).

Both parties discuss the applicability of *Broome Cnty. v. Traveler's Indem. Co.*, in which the defendant-insurance company sought to exclude coverage using a remarkably similar exclusionary clause. *See generally Broome Cnty. v. Traveler's Indem. Co.*, 125 A.D.3d 1241 (3rd Dep't 2015). In that case, during construction on a parking garage underneath a building that the plaintiff owned, construction work caused silica dust to migrate up an elevator shaft and disperse into all of the floors in the plaintiff's building. *See id.* at 1241.

The exclusionary clause stated that the defendant-insurance company "'[would] not pay for loss or damage caused by or resulting from … [f]aulty, inadequate or defective'" "'(1) [p]lanning, zoning, development, surveying, siting …'" "'(2) … workmanship, repair, construction, renovation [or] remodeling[,]'" "'(3) [m]aterials used in repair, construction, renovation, or remodeling; or (4) [m]aintenance.'" *Id.* at 1243-44. The plaintiff argued that the exclusion was ambiguous – and thus must be construed in its favor – "because faulty workmanship can relate to 'the flawed quality of a finished product' or to a 'flawed process' in the construction work." *Id.* at 1243.

The court rejected the plaintiff's argument, ultimately holding that "[r]eading all of these subdivisions together and considering the clause as a whole, including its use of the disjunctive 'or,' the average insured would reasonably expect the exclusion to apply to the faulty

- 9 -

workmanship whether it was caused by a flawed process or measured by the flawed quality of the finished product." *Id.* at 1244 (citations omitted). "Contrary to plaintiff's argument that the clause is ambiguous because a term within it can be read in two different ways, an ambiguity is not created if the policy is written to exclude coverage under both definitions." *Id.* Thus, according to the *Broome Cnty.* court, the term "workmanship" can constitute a "flawed product" *or* a "flawed process."

Plaintiffs point out that the *Broome Cnty.* court applied the term "workmanship" in the construction context, which is consistent with their position that "workmanship" applies only to damages occurring in the framework of construction or development. *See* Dkt. No. 60, Pls' Reply, at 7. Although Defendant contends that dismantling, transporting, and installing the Press constituted a "flawed process," *see* Dkt. No. 57, Def's Memorandum in Opposition, at 16, the Court finds that it is not analogous to the construction workers' "flawed process" of permitting silica dust to migrate through the elevator shaft in *Broome Cnty.*[3] Furthermore, Defendant did not submit evidence to show that it was the *process* that caused the Press's damage. For example, Defendant did not assert that the process of putting the print units on wooden blocks was faulty; it may have worked perfectly except that one block unforeseeably collapsed.

Additionally, as Plaintiffs argue in their memoranda, if accidental or fortuitous damage, disassembly, transport, and installation of Covered Property *all* constitute a "flawed process," then the Exclusion would supersede the Policy, thus making the insurance contract illusory.

---

[3] Defendant's argument also ignores the fact that there is a transit provision in the Policy that provides, "[t]his insurance is extended to apply to direct physical loss or direct physical damage by a Covered Cause of Loss to the following Covered Property while in the due course of transit: (1) Your Business Personal Property; and (2) Business Personal Property owned by others that is in your care, custody or control." *See* Dkt. No. 54-5, Ex. 1, at 33.

Courts are discouraged from interpreting insurance policy exclusions in this way. *See Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 685 (2017) (holding that the exclusion was not illusory because it "d[id] not create a result that 'would have the exclusion swallow the policy'"" (quotation omitted)).

Finally, the Court applies "the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008) (citations omitted); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) (relying on "the principle of *noscitur a sociis*—a word is known by the company it keeps—'to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving [it] unintended breadth…'" (quotation and other citation omitted)); *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76-77 (1955) (applying the principle of *noscitur a sociis* to interpret the meaning of a word in a list in an insurance contract). Applying the canon of *noscitur a sociis*, one reading the Exclusion could find that the term "workmanship" was meant to preclude coverage for faulty *building* of a product or piece of property. The word "workmanship" is listed among other words related to development, construction, and real property. Thus, "workmanship" likely means what one would expect it to mean, "the execution or manner of making or doing something," not mere accidents. *See Wider v. Heritage Maint., Inc.*, 14 Misc. 3d 963, 975 (Sup. Ct. N.Y. Cnty. 2007) (quoting *Webster's Third New International Dictionary*).

Even if the Court were to find that the term "workmanship" unambiguously encompasses a "flawed product or process" and had no other meaning, Defendant has not shown that it is applicable to the situation at hand. The parties agree that the Press was damaged by accidental or fortuitous events while being disassembled, transported, and installed, *not* while being built

or made. The Court finds that such accidental or fortuitous events are not "workmanship" because they are not encompassed in a "flawed process." Accordingly, Defendant has not satisfied its burden of establishing that the Exclusion applies.

**D. Coverage for lost business income**

The parties further dispute whether Plaintiffs are entitled to insurance coverage under the Policy for Special Business Income and Extra Expenses. The Policy provides the following:

> A. COVERAGE
>
> We will pay … for the actual loss of Business Income you sustain and the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at "Scheduled Premises" …
>
> 1. Business Income means:
>
>    a. Net Income (Net Profit or Net Loss before income taxes), including Rental Income and Royalties, that would have been earned or incurred; and
>    b. Continuing normal operating expenses incurred, including Payroll Expenses.
>    c. …
>    d. For manufacturing businesses, Net Income also includes the net sales value of production.
>    e. …
>    f. …
>
> 2. Extra Expense means the actual, necessary and reasonable expenses you incur during the Period of Restoration that you would not have incurred if there had been no direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at "Scheduled Premises". We will pay Extra Expense (other than the expense to repair or replace property) to:
>
>    a. Avoid or minimize the suspension of business and to continue operations at a "Scheduled Premises" or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

> b. Minimize the suspension of business if you cannot continue operations.
> …

*See* Dkt. No. 54-5, Ex. 1, at 60.

Additionally, the Policy provides that the amount of Business Income loss will be determined based on the following:

> (1) The Net Income of the business before the direct physical loss or direct physical damage occurred;
> (2) The likely Net Income of the business if no physical loss or no physical damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses.
> (3) The operating expenses, including payroll expenses, necessary to resume business operations with the same quality of service that existed just before the direct physical loss or direct physical damage, and
> (4) Other relevant sources of information, …

*See id.* at 62.

In particular, the parties dispute whether Plaintiffs are entitled to lost profits, lost labor savings, and delayed maintenance savings. Plaintiffs base their lost profits claim on three instances. First, Plaintiff Vanguard sold and removed a "Hantscho" press in September 2016 to prepare to install the Press, but Plaintiff Vanguard could have operated the "Hantscho" press between September 2016 and May 2017 if it had known the Press would be inoperable upon installation. *See* Dkt. No. 54-1 at 25-26. Second, before learning that the Press was inoperable, Plaintiff Vanguard bid on thirteen different publication titles with Bauer Publishing, including "Closer" and "In Touch," which Bauer wanted to place with Plaintiff Vanguard. *See id.* at 26. However, Bauer Publishing was forced to award that print work to other printers because the Press was inoperable. *See id.* Third, Plaintiff Vanguard was unable to take on extra work from DC Entertainment because it could not do so profitably on its M130 printing presses, but it could have taken on the extra work had the Press been operational. *See id.* at 27. Defendant, in

response, argues that Plaintiffs' lost profit claims are too speculative, and it asserts that Plaintiffs failed to mitigate their losses. *See generally* Dkt. No. 57 at 28-29; *see also* Dkt. No. 55-19 at 20-24; Dkt. No. 62, Def's Reply, at 12-14.

Plaintiffs also make three key points to support a judgment for lost labor and maintenance expenses. First, Plaintiff Vanguard complained that, during the time that the Press was commercially inoperative, it nevertheless incurred lease payments to Plaintiff Koursa totaling $135,800. *See* Dkt. No. 54-1 at 28. Second, Plaintiffs claim that their damages for lost labor savings represent the amount of money that Plaintiff Vanguard expended on labor costs during the time the Press was commercially inoperative, but which it would not have incurred if the Press had been operational. *See* Dkt. No. 59 at 25-26. Plaintiffs assert that this was because the Press was far more efficient than the other printing presses; and, thus, it required lower labor costs to run. *See id.* at 26. Third, Plaintiffs' damages for delayed maintenance savings represent the amount of money that Plaintiff Vanguard expended on maintenance costs during the time the Press was commercially inoperative, but which it would not have incurred if the Press had not been damaged. *See id.* These costs, Plaintiffs argue, constitute expenses incurred during the Period of Restoration, which Plaintiff Vanguard would not have incurred if there had been no direct physical loss or damage to the Press; and, as such, fall squarely within the Policy's definition of "Extra Expense[s]." *See id.*

Defendant argues that there is no coverage under the Policy for such purported losses as "lost labor savings due to delay in operation," or "delayed maintenance savings." *See* Dkt. No. 55-19 at 23. Alternatively, Defendant asserts that those claims are predicated on speculation that a thirteen-year-old printing press would have performed to a certain level had it not been damaged. *See id.* at 24; *see also* Dkt. No. 57 at 29; Dkt. No. 62 at 14.

"'[T]he initial interpretation of a contract is a matter of law for the court to decide.'" *Parks Real Estate Purchasing Group*, 472 F.3d at 42 (quoting *Morgan Stanley Group Inc.*, 225 F.3d at 275 (internal quotation marks omitted)). As discussed above, courts must enforce provisions of contracts that are "unambiguous and understandable." *See id.* (citation omitted). Here, the parties dispute whether the language of the Policy permits Plaintiffs to recover lost profits and extra expenses.

The language of the Policy is clear and unambiguous. Defendant promised to pay for the "actual loss of Business Income" Plaintiffs sustained and the "actual, necessary and reasonable Extra Expense[s]" they incurred due to the "necessary interruption" of their business operations "during the Period of Restoration due to direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss[.]" *See* Dkt. No. 54-5, Ex. 1 at 60. The Policy then defines the terms "Business Income" and "Extra Expense," and lists factors to be considered when calculating lost Business Income. *See id.* at 60, 62. Those factors notably include the business's net income before the damage or loss and its net income had the damage or loss never occurred. *See id.* at 62. Keeping this language from the Policy in mind, the Court addresses Plaintiffs' three claims for lost profits in turn.

First, Plaintiffs owned and operated the Hantscho press through September 2016, removing and selling it only so that they would have room for the Press when it arrived. *See* Dkt. No. 54-2 at ¶¶ 30-31. Plaintiffs could have operated the Hantscho press from September 2016 through May 2017 had they known that the Press would be commercially inoperative. *See id.* at ¶ 35. Because Plaintiffs operated the Hantscho press before they acquired the Press, they can show their net income before the Press was damaged. Therefore, a reasonable factfinder could

determine that Plaintiffs are entitled to lost profits under the Policy for the period of time when they did not have access to either printing press.

Furthermore, Plaintiffs allege that there were negotiations between Bauer Publishing and Plaintiff Vanguard regarding the In Touch and Closer publications, though a final contract would have been predicated on the Press's full functionality. *See id.* at ¶¶ 37-38. Plaintiff Vanguard also noted that it had previously run jobs for Bauer Publishing on its M130 presses. *See id.* at ¶ 40. Between Plaintiff Vanguard's and Bauer Publishing's lengthy negotiations and prior contracts, Plaintiff Vanguard could reasonably calculate the net income it would have earned from printing the In Touch and Closer publications had the Press been operable. Thus, a reasonable factfinder could find in favor of Plaintiffs with respect to these lost profits.

Finally, Plaintiffs contend that, in January 2017, DC Entertainment asked Plaintiff Vanguard to bid on a long-term contract for its print jobs, advising that it wanted to place approximately $1.5 million worth of print business with Plaintiff Vanguard and gradually increase that volume of business to as much as $3 million. *See id.* at ¶¶ 51-52. Plaintiff Vanguard already had a business relationship with DC Entertainment and had produced print jobs for it on its M130 presses in the past. *See id.* at ¶ 45. Plaintiff Vanguard negotiated a long-term contract with DC Entertainment and responded to bid requirements for the company, but it did so cautiously until it knew that the Press would be operational. *See id.* at ¶¶ 53-55. Once the Press was commercially operational, Plaintiff ran print jobs for DC Entertainment on it; but, until then, it was left to rely on its M130 presses, which were less efficient and more expensive to run. *See id.* at ¶¶ 56-57. Based on Plaintiff Vanguard's long-term relationship with DC Entertainment, its negotiations, and its eventual long-term contract, Plaintiffs could show both their net profits before the Press was received damaged and if it had been operational since it

was installed. Accordingly, a reasonable factfinder could conclude that Plaintiffs were entitled to these lost profits under the Policy.

In sum, the parties do not dispute that the Press was Covered Property or that the damage was caused by a Covered Event. *See* Dkt. No. 59 at 7 (citing Dkt. No. 55-19 at 15-19). As the Court found above, Plaintiffs are entitled to insurance coverage to the extent the Policy allows. The Policy clearly permits Plaintiffs to recover some lost profits and extra expenses caused by the physical damage and loss of the Press.[4] The Court further finds that Plaintiffs have met their burden of showing that they lost profits and that a reasonable factfinder could conclude that those lost profits were covered under the Policy. Finally, the *amount* of lost profits and extra expenses to which Plaintiffs are entitled creates an issue of fact that the Court cannot determine at the summary judgment stage. A factfinder will have to determine the disputed amount of damages after considering all of the evidence. Thus, for the above-stated reasons, the Court grants Plaintiffs' motion for partial summary judgment entitling them to coverage for lost profits and extra expenses as the Policy allows and denies Defendant's motion for summary judgment requesting the Court dismiss Plaintiffs' claims.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for partial summary judgment, *see* Dkt. No. 54, is **GRANTED**; and the Court further

---

[4] The Court notes that "lost labor savings" and "delayed maintenance savings" as Plaintiffs describe them are clearly covered by the Policy as Extra Expenses that would not have been incurred had the Press not been damaged. *See* Dkt. No. 54-5, Ex. 1 at 60.

**ORDERS** that Defendant's cross-motion for summary judgment, *see* Dkt. No. 55, is **DENIED**; and the Court further

**ORDERS** that trial of this action shall commence at **10:00 a.m.** on **August 25, 2020**, in **Syracuse, New York.** The Court will issue a separate Final Pretrial Scheduling Order, setting forth the deadlines for filing pretrial submissions, including motions *in limine*, at a later date.

**IT IS SO ORDERED.**

Dated: April 8, 2020
Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge